133 P.3d 924 (2006)
205 Or. App. 152
In the Matter of Tranequa Smith, a Minor Child.
STATE ex rel JUVENILE DEPARTMENT OF MULTNOMAH COUNTY, Respondent,
v.
Conchita SMITH, Appellant.
In the Matter of Tranequa Smith, a Minor in Need of a Guardian.
Conchita Smith, Appellant,
v.
State Of Oregon (DHS), Respondent.
8808-823128, 0504-90583; A128612.
Court of Appeals of Oregon.
Argued and Submitted December 5, 2005.
Decided April 19, 2006.
*925 Maryhelen Sherrett, Portland, filed the brief for appellant.
Michael C. Livingston, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.
Karen S. Torry, Portland, argued the cause and filed the brief for Minor Child.
Before SCHUMAN, Presiding Judge, and LANDAU[*] and ORTEGA, Judges.
SCHUMAN, P.J.
The Department of Human Services (DHS) petitioned the Multnomah County Circuit Court to appoint a guardian for T, a severely disabled three-and-a-half-year-old ward of the court in the custody of DHS. In particular, DHS sought a guardian to act as T's health care representative with authority to decide whether to withhold or withdraw life-sustaining procedures, even over the objection of T's mother. The court granted DHS's petition, and mother appeals. We affirm.
We begin with an overview, amplified in the body of the opinion, so as to make clear at the outset what our decision holds and, more importantly, what it neither holds nor implies.
T is a child who, according to her attending physician, is conscious but neurologically and orthopedically devastated. DHS is T's legal guardian. She has been in medical foster care since birth, initially because of mother's substance abuse but subsequently, after mother's apparently successful treatment, because mother was unable to provide the specialized around-the-clock treatment that T requires. DHS believes that T's best interest would be served by a "do not resuscitate" order (DNR) directing physicians, in the event of certain cardiac or respiratory events, to refrain from applying artificial ventilation, CPR, or other procedures that would save T's life but cause permanent pain and worsen her baseline condition. Mother disagrees. Although not necessarily opposed to the idea of not resuscitating T, mother prefers to make the decision only at the time of the crisis, and only in accord with her religious beliefs, including her belief in miracles.
Although no Oregon law explicitly permits one person to authorize a DNR for an incapacitated minor, that power is included in a more expansive grant: the power to make all health care decisions, including the withholding or withdrawal of life-sustaining procedures. In certain limited circumstances, and if the minor does not have an appointed health care representative, that power can be exercised, even contrary to the wishes of the minor's parent, by a health care guardian, that is, a "guardian of the principal who is authorized to make health care decisions." ORS 127.635(2)(a).[1] In the proceeding below, *926 DHS petitioned the court to appoint such a guardian. Despite the fact that, by operation of ORS 419B.370(1), DHS was T's general guardian under the juvenile code, the agency chose not to seek appointment of itself as the health care guardian under ORS chapters 125 and 127, apparently for three reasons: first, it believed that such an appointment might not be within the juvenile court's power; second, it believed that such an appointment could create the appearance of a conflict of interest, in that DHS is a state agency and the continued care of T could cost the state a large amount of money; and third, it believed that a neutral guardian could approach the medical decision-making with an open mind, whereas DHS was already on record as favoring the DNR. It therefore petitioned the court to appoint an experienced and independent private family law attorney, Lechman-Su, as health care guardian. The court granted the petition. Mother appeals.
As is clear from the foregoing, the sole issue before us at this time is whether the court lawfully exercised its statutory authority to appoint Lechman-Su as T's guardian with the authority to make health care decisions. What is not before us, what was not before the trial court, and what we do not decide, is whether a DNR (or the withholding or withdrawal of life-sustaining procedures) is justified under the circumstances of this case. In other words, we are called upon in this case to determine whether the court lawfully gave Lechman-Su the authority to make certain health care decisions at some time in the future, should the need arise. Because no such decision has been made, we are obviously not called on to review it. Should such a decision be rendered in the future, mother will have the opportunity to test its legality in court.
Our review of the trial court's order involves two questions. The first is whether the court acted within its statutory authority. Because we hold that it did, we also confront the second: Does the court's action violate mother's fundamental right under the Fourteenth Amendment to the United States Constitution to make decisions regarding the care, custody, and control of her biological child? See Troxel v. Granville, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). We conclude that the statutes were constitutionally applied in this case.
We begin with the statutory scheme under which the court appointed Lechman-Su. It is not simple.
Because the juvenile court had established jurisdiction over T in a dependency case, its action must stem from authority granted within the juvenile code, ORS chapter 419A-C. Kelley v. Gibson, 184 Or.App. 343, 349-50, 56 P.3d 925 (2002). That authority begins at ORS 419B.370(1), under which DHS became the guardian of T when the court *927 granted the agency custody over her.[2] As guardian under the juvenile code, DHS has the authority to "make * * * decisions concerning the ward of substantial legal significance." ORS 419B.376(5). The decision to seek a guardian for purposes of making health care decisions is clearly a "decision concerning [T] of substantial legal significance." Thus, DHS, as the general juvenile court guardian for T, has the authority to seek the appointment of a guardian for purposes of acting for the minor in proceedings described in ORS chapter 125. Such appointments are governed by ORS 125.305.[3]
ORS 125.305(1), in turn, allows the court to appoint a guardian for a "respondent," including a minor, if the court determines by "clear and convincing evidence" that the minor respondent "is incapacitated," "[t]he appointment is necessary as a means of providing continuing care and supervision" of the minor respondent, and the nominated guardian is "qualified and suitable, and is willing to serve."[4] In deciding whether to make that appointment, the court
"shall consider the information in the petition, * * * the report of any physician or psychologist who has examined the [minor], if there was an examination and the evidence presented at any hearing."
ORS 125.305(2). The powers of a guardian so appointed include the power to withhold or withdraw consent to health care. ORS 125.315(1)(c). "Health care" includes the withdrawal or withholding of life-sustaining procedures and artificially administered nutrition and hydration pursuant to ORS 127.635. ORS 127.505(7). A guardian's decision supersedes a contrary decision by the minor's parent. ORS 127.635(2).
Thus, to focus and recapitulate: The dispositive issue here is whether this case presents a situation meeting the criteria for the appointment of a guardian under the criteria of ORS 125.305. If so, then the juvenile court properly appointed Lechman-Su as guardian for the limited purpose of making health care decisions.[5] As a health care guardian properly so appointed, Lechman-Su becomes the "health care representative" under ORS 127.635(2)(a) with authority to make the decision whether to withhold or withdraw life-sustaining procedures, despite mother's objections.
The key question, then, is this: On de novo review, ORS 19.415(3), do we conclude that *928 the record shows by clear and convincing evidence that the criteria of ORS 125.305 are met? That is, does the record show that (1) T is incapacitated; (2) appointment of a guardian is necessary as a means of providing continuing care and supervision of T; and (3) the appointed guardian is qualified, suitable, and willing to serve? ORS 125.305(1). With that legal framework as background, we turn to the facts.
T was born at mother's home on November 28, 2001, at 29 weeks' gestation. The premature labor was triggered by a placental abruption caused, in turn, by mother's cocaine use; at the time of the birth, both mother and T tested positive for that substance. Although T was without oxygen for 24 minutes, she was successfully resuscitated by paramedics. However, as a result of the oxygen deprivation, she suffered brain injury, intracranial bleeds, intractable seizures, and spastic quadriplegia. She was unable to eat on her own.
Five days after T's birth, pursuant to ORS 419B.100(1)(c), the state petitioned the court to take jurisdiction over T because of her medical condition and mother's substance abuse. The court agreed and named DHS as T's temporary legal custodian, ORS 419B.373, committing T to DHS for care, placement, and supervision. At a dependency review hearing in February 2002, the court noted in its order that "[t]he child's doctors at Emanuel [Hospital] have indicated that a DNR [do-not-resuscitate] order is appropriate in this case." No such order was requested at that time.
Subsequent dependency review hearings and citizen review board (CRB) hearings were held in the ensuing months, the results of which indicate mother's favorable progress in becoming drug free and a cautious desire on the part of the juvenile court and DHS to return T to mother's care.[6] On March 19, 2002, the court noted that "[mother] is doing well in treatment" and, just a few months later, the CRB agreed with that statement, adding that "[p]rogress has been made to alleviate the need for placement." On July 23, 2002, the court's dependency review order explained:
"Since the last hearing [mother] completed in-patient treatment and is now in outpatient treatment. [Mother] has completed parenting [sic] and is employed collecting scrap metal. [Mother] has completed an updated psychological [examination] * * * that is pessimistic, given her history of substance abuse and personality disorder, that [mother] will be able to maintain long term stability. [Mother] has made good progress in completing treatment[;] however, given the psychological [exam] it is important that any plan for reunification be proceeded upon cautiously after [mother] has had a significant period of stability and sobriety."
At the conclusion of the July 23 hearing, mother signed a service agreement with DHS, the purpose of which was to assure the welfare of T "and to assist in the children returning home from foster care, if at all possible." In signing that document, mother agreed, among other things, to visit with T on a regular basis, to attend all of T's medical appointments, and to learn caregiving skills from T's medical foster parent, Qualls.
Six months later, in January 2003, the court issued a permanency order continuing T in medical foster care. The order explained that, despite mother's progress in the substance abuse program, T's "medical condition is such that medical foster care is necessary and neither return to parent nor adoption at this time is appropriate." In March 2003, the court additionally noted, "While [mother] would like, in the future, to have [T] placed with her, she is in agreement with DHS's plan at this time."
In June 2003, T's primary physician, Karen Lickteig, M.D., met with mother to discuss T's long-term medical needs. Lickteig explained to mother the likelihood that T's condition would worsen over time and the further physical trauma that would result from putting T on a ventilator or administering *929 CPR. Lickteig's report to DHS explained:
"[Mother] says that she understands that these are [T's] problems. She says that she is not willing to sign any piece of paper that says don't do this or do this. She feels that there are miracles and that she prays every day for [T] and so do her other children, and that anything could happen.
"* * * * *
"In addition, I would like to add that * * * Qualls, [T's] foster mother, tells me that [T's] mother comes to the visits that she has set up with her approximately 1 to 1½ times out of 8 visits per month and that she seems to be withdrawing more and more from [T]."
Subsequent hearings in the juvenile court revealed that, although mother was continuing to maintain sobriety and provide a stable home for one of T's brothers, T's placement in medical foster care remained necessary due to her extremely precarious and care-intensive medical condition.
In January 2005, the juvenile court stated in its permanency hearing judgment that "[t]he mother visits some with [T]. She is supportive of [T] in her permanent medical foster care placement." Nevertheless, the court explained that T's special medical needs required that her placement in permanent foster care continue; T had experienced two episodes in preceding months that had caused her to stop breathing. As a result of the treatments necessary to resuscitate T, her condition had further deteriorated. In that same judgment, the court indicated, "[T's attorney], based upon [T's] medical condition, and the recommendations of her doctors and foster parent, is now requesting that a DNR order be put into place." DHS, mother, and Lickteig subsequently had a meeting at which Lickteig attempted to describe T's condition and prognosis to mother and to elicit her consent to a DNR. Mother again refused, citing religious objections.
At that time, none of the orthopedic or neurological damage that T incurred at birth had improved. Indeed, it had deteriorated. She remained dependent on a tracheostomy to breathe and a gastric tube to eat and drink. She had also developed chronic lung disease, cerebral palsy, progressive scoliosis, and dislocated knees and hips. She could not crawl, walk, sit, or hold up her head. She was not able to cough or clear her throat and, as a result, required frequent suctioning to ensure that her airway remained unobstructed. She was deaf, either blind or nearly so (her eyes do not track objects), and unable to communicate in any way. She was able, however, to recognize the touch of her foster mother, and she was capable of feeling pain. According to her attending physician and two concurring physicians, her condition was irremediable and she would continue to deteriorate.
In April 2005, DHS filed a petition for appointment of a guardian who, for purposes of ORS 127.635(2)(a), could "act as [T's] `health care representative' * * * to make health care decisions," which, as noted above, would include the decision in appropriate circumstances, to withhold or withdraw life-sustaining procedures. After a hearing, the court granted the petition. Echoing the language of ORS 125.305, the court found by clear and convincing evidence:
"1. The child is in need of a guardian who is authorized to act as a health care representative for the child in making the health care decisions authorized under ORS 127.635;
"2. The appointment of a guardian for the child is necessary as a means of providing continuing care and supervision of the child;
"3. Brad Lechman-Su is qualified, suitable and willing to serve as the guardian[.]"
Accordingly, the court appointed Lechman-Su as T's guardian with authority to make decisions "regarding withholding or withdrawing life-sustaining procedures for [T]"; those decisions, however, can be made only after consulting with T's family, DHS, and T's attorney. Further, the order specified that Lechman-Su had to report any such decisions to the court. In explaining its decision, the court stated:
"Simply put, the agency and the doctors are in need of someone who is in a position *930 to make decisions for this child who has the knowledge base and the involvement with this child to make the decisions.
"And this is not the case where [mother] has been in a position toshe's chosen not to visit her child. She has chosen not to be involved in the health care decision-making on a regular basis, and those were all opportunities that she had that she has chosen not to involve herself in. And the agency is in need of someone who they can look to, as are the doctors, who can make a knowledgeable, reasonable decision.
"* * * * *
"[T]his is not a question of faith versus not faith. This is a question of someone needs to be in a position of having enough contact with this child and her doctors to make the decisions that need to be made on her behalf."
On appeal, mother renews her argument that she should be the one to make health care decisions of this magnitude for T. As indicated above, however, mother's wishes are subordinate to the wishes of a duly appointed guardian with authority to make health care decisions; that person becomes the "health care representative" under ORS 127.635(2)(a). As noted above, we must therefore determine whether the guardian was, in fact, duly appointed pursuant to ORS 125.305(1).
It is undisputed that T is incapacitated and that Lechman-Su is qualified, suitable, and willing to serve. ORS 125.305(1)(a) and (c). The crux is whether, in light of the record, there is clear and convincing evidence that "[t]he appointment is necessary as a means of providing continuing care and supervision of the respondent." ORS 125.305(1)(b). We hold that such an appointment is necessary under that criterion and in light of DHS's unwillingness to serve in that capacity.
Like the trial court, we do so based not on mother's religious convictions but on the nature of her relationshipor, more accurately, her nonrelationshipwith T. Further, we emphasize that, despite the imprecision of the statutory language, the criterion that the statute establishes is stringent, at least where the guardian replaces a minor's parent. See Troxel, 530 U.S. at 68, 120 S.Ct. 2054 (explaining presumption that fit parents act in their children's best interests). The fact that a child might fare better with a guardian than with a parent does not suffice. The substitution must be necessary, that is, the consequences of not effecting a substitution must be seriously detrimental. That is the case here. As one witness testified, mother is a stranger to T in every way except biologically. When T was born, mother's substance abuse prevented her from establishing a mother-child relationship. But even as mother has commendably made progress in overcoming substance abuse, she has not taken even the most rudimentary steps to bring T into her life. Despite the encouragement and cooperation of DHS and T's foster mother, mother has visited T only rarely. At first, she would attend approximately one out of every eight scheduled visits. Later, even that sporadic attention diminished. In the five months before the guardianship hearing, mother saw T only once, and on that occasion, T's birthday, T's foster mother took her to mother's house. Before that visit, none had occurred for "a long time." Contrary to a provision of her service agreement with DHS, mother has never attended T's medical appointments nor has she made any effort to learn to care for T. She has spoken with the attending physician on fewer than three occasions, none of which was initiated by her. She has never asked T's DHS caseworker for medical information.
Mother, therefore, is in no position to make decisions regarding T's medical care.
*931 Such decisions must be made by a person with a basic awareness of T's medical condition and prognosis. Mother has neither. Her lack of attention to T has been manifest and, despite her testimony to the contrary, we are persuaded by the testimony of others at the guardianship hearing that mother lacks awareness of the medical facts upon which any decision to withdraw or withhold life-sustaining procedures must be based even a decision informed by sincere religious beliefs. Thus, we agree with the trial court that, under the criteria in ORS 125.305(1), the appointment of a guardian is lawful. That being the case, we also conclude that the statutes give the guardian authority to withdraw or withhold life-sustaining procedures[7] according to the criteria and procedures detailed in ORS 127.505 to 127.660.
The fact that statutes authorize action does not end our inquiry; actions taken in compliance with statutes must also conform to constitutional limitations on state power. We therefore must determine whether the trial court's decision to give health care decision-making authority to a guardian violates mother's fundamental right to exercise control over her child. That right was most recently and most thoroughly explained in Troxel, 530 U.S. at 65, 120 S.Ct. 2054 where the Court reiterated the settled conclusion that "the interest of parents in the care, custody, and control of their children * * * is perhaps the oldest of the fundamental liberty interests recognized by this Court." The Court went on to hold that a fit parent is presumed to know what is in the best interest of his or her child and that this presumption must be given special weight when a parent's decision about the child competes with a nonparent's. Id. at 69-70, 120 S.Ct. 2054. For the reasons that follow, we conclude that the court's decision does not violate mother's rights under either Troxel or O'Donnell-Lamont and Lamont, 337 Or. 86, 91 P.3d 721 (2004), cert. den., 543 U.S. 1050, 125 S.Ct. 867, 160 L.Ed.2d 770 (2005), the leading case in which the Oregon Supreme Court interpreted Troxel.
The right that Troxel protects does not automatically attach to every parent by virtue of parenthood alone. As the justices state throughout several opinions, the right attaches only to a fit parent.[8] The court in O'Donnell-Lamont shed some light on what the term fit means. The court tells us that the degree of unfitness that the state needs to establish in order to overcome the presumption in favor of the parent is directly proportional to the seriousness of the interference with the parent that the state seeks to impose:
"This case involves a third-party custody dispute between grandparents and father. In contrast to a proceeding to terminate parental rights under ORS 419B.498 to 419B.530, the state is not a party to this case, no one claims that father is `unfit' to be a parent, and father's status as a legal parent is not at issue. The only issue here is custody. Although any decision awarding custody to a third party is a serious intrusion on a parent's right to care for and make decisions for a child, it is less drastic than the termination of the parent-child relationship * * *.
"A custody dispute also involves a less significant interference with parental rights than does a juvenile dependency *932 proceeding in which the court determines that a child is within the jurisdiction of the court based on a finding that a parent has, among other things, abandoned the child or failed to provide `care, guidance and protection necessary for the physical, mental or emotional well-being' of the child, ORS 419B.100(A), (D). In those circumstances, as in a termination proceeding, the state intervenes to relieve a parent of ordinary parental responsibilities and to assume control over decisions about such matters as shelter and health care.
"On the other hand, a custody decision involves a greater potential intrusion on parental interests than a decision regarding visitation."
337 Or. at 97, 91 P.3d 721 (citations omitted; emphasis in original). The present case does not involve a termination of parental rights, and, although the health care decision that it does involve is a very important one, the court specified that it cannot be made without mother's knowledge and participation. Thus, the state need not establish that mother is unfit as that term is defined for purposes of termination. Id. at 101, 91 P.3d 721.
Troxel provides guidance in another respect. In holding that the State of Washington unconstitutionally interfered with the mother's liberty interest, the Court paid particular attention to several aspects of the state's statutes, both as written and as applied. First, it noted that "Washington['s] nonparental visitation statute is breathtakingly broad" in that it allowed the court to "disregard and overturn any decision by a fit custodial parent concerning visitation * * * based solely on the judge's determination of the child's best interests." Id. at 67, 120 S.Ct. 2054 (emphasis in original). That is not the case here. Before giving the nonparent authority to displace the parent for purposes of making a decision to withdraw or withhold life-sustaining procedures, the court determined first that the child was in need of a general guardian under the criteria in ORS 419B.370(1), and then, by clear and convincing evidence, that a guardian was necessary in order to provide care and supervision for the stated limited purpose, and that the guardian is qualified and suitable. ORS 125.305(1).
Second, the Troxel Court emphasized that neither the parties seeking to displace the parent nor any court had alleged that the parent had failed adequately to care for her children. Troxel, 530 U.S. at 68, 120 S.Ct. 2054. In the present case, the court found (and we agree) that mother lacked "the ability to make decisions as to what will and will not benefit [T], what will and will not harm her." As the court observed,
"This is a mother who, over the years, * * * has not visited her child for a significant period of time. There has always been the ability to access the doctors and medical information. That has not been done.
"So we have a parent who does not visit, who does not contact the doctors, who does not contact the caseworker to get information.
"* * * * *
"[W]e have a mother who has talked to * * * this child's primary physician who sees her one to two times a month over the past three years, that the mother has talked to this doctor twice; has not sought out information; has not been involved in the medical appointments[.]
"* * * * *
"And this is not the case where [mother] has been in a position toshe's chosen not to visit her child. She has chosen not to be involved in the health care decision-making on a regular basis, and those were all opportunities that she had that she has chosen not to involve herself in."
Thus, in the present case, the state established that mother was unfitnot generally, but with respect to making the decision to withhold or withdraw life-sustaining procedures.
Third, the Troxel Court noted that the Washington statutes, as written and as applied to the parent by the state courts, "gave no special weight at all to [the parent's] determination of her daughters' best interests"; rather, the statutes appeared to impose on the parent the burden of proving that losing her control over her child *933 would cause harm. Id. at 69, 120 S.Ct. 2054. Again, that is not the case here; under Oregon's statutory scheme, the state bears the burden of establishing the need for a guardian, and it must meet that burden by clear and convincing evidence.
In sum, we find that the facts of this case significantly distinguish it from Troxel itself and from the kind of cases that, under Troxel, raise questions implicating the right of fit parents to make unfettered decisions about the care, custody, and control of their children. The trial court acted within its statutory authority in appointing a guardian for the purpose of acting as T's health care representative with the power to decide whether to withhold or withdraw life-sustaining procedures, should such a decision, in his judgment and after consultation with mother and the court, become proper. Further, in so deciding, the court did not violate mother's constitutional rights.
Affirmed.
NOTES
[*] Landau, J., vice Richardson, S.J.
[1] ORS 127.635 provides, in part:

"(1) Life-sustaining procedures as defined in ORS 127.505 which would otherwise be applied to an incapable principal who does not have an appointed health care representative or applicable valid advance directive may be withheld or withdrawn in accordance with subsections (2) and (3) of this section if the principal has been medically confirmed to be in one of the following conditions:
"(a) A terminal condition;
"(b) Permanently unconscious;
"(c) A condition in which administration of life-sustaining procedures would not benefit the principal's medical condition and would cause permanent and severe pain; or
"(d) The person has a progressive illness that will be fatal and is in an advanced stage, the person is consistently and permanently unable to communicate by any means, swallow food and water safely, care for the person's self and recognize the person's family and other people, and it is very unlikely that the person's condition will substantially improve.
"(2) If a principal's condition has been determined to meet one of the conditions set forth in subsection (1) of this section, and the principal does not have an appointed health care representative or applicable advance directive, the principal's health care representative shall be the first of the following, in the following order, who can be located upon reasonable effort by the health care facility and who is willing to serve as the health care representative:
"(a) A guardian of the principal who is authorized to make health care decisions, if any;
"* * * * *
"(e) Either parent of the principal[.]
"* * * * *
"(4) Life-sustaining procedures may be withheld or withdrawn upon the direction and under the supervision of the attending physician at the request of a person designated the health care representative under subsections (2) and (3) of this section only after the person has consulted with concerned family and close friends, and if the principal has a case manager, as defined by rules adopted by the Department of Human Services, after giving notice to the principal's case manager."
[2] At the hearing in this case, the court stated on the record, "I will make it clear that the agency does have guardianship since our orders previously left that out[.]" The Supreme Court has held that "[i]f the decree of the court in the equity case * * * fails to show the issues decided, resort may be had to the opinion of the trial judge, to clarify the decree." Emerick v. Emerick, 171 Or. 276, 285, 135 P.2d 802 (1943).
[3] In Kelley, we held that the juvenile court did not have the authority to act as a probate court for purposes of appointing a permanent guardian under ORS 125.305. 184 Or.App. at 348, 350, 56 P.3d 925. Our holding was based on the conclusion that the provisions of ORS 125.305 conflicted with the juvenile code's provisions for establishing a permanent guardianship, ORS 419B.365, and that the juvenile code provisions were exclusive. Id. at 349-50, 56 P.3d 925. In the present case, DHS does not seek, and the trial court did not appoint, a permanent guardian. ORS 419B.365 therefore does not apply, and there is no conflict between the juvenile code and ORS 125.305. Although ORS 419B.373(4) permits DHS to authorize "extraordinary care" in health care emergencies, that statute does not prohibit DHS from delegating that authority pursuant to ORS 419B.376(5). In fact, as we explain above, because DHS is exercising juvenile code authority in seeking a limited guardianship under ORS 125.305, nothing prevents the juvenile court from applying that statute's criteria.
[4] ORS 125.305(1) provides, in part:

"After determining that conditions for the appointment of a guardian have been established, the court may appoint a guardian as requested if the court determines by clear and convincing evidence that:
"(a) The respondent is a minor in need of a guardian or the respondent is incapacitated;
"(b) The appointment is necessary as a means of providing continuing care and supervision of the respondent; and
"(c) The nominated person is both qualified and suitable, and is willing to serve."
We have been unable to determine what the phrase "conditions for the appointment of a guardian" refers to in this case beyond those listed in paragraphs (a) through (c). Cf. Burk v. Hall, 186 Or.App. 113, 120, 62 P.3d 394, rev. den., 336 Or. 16, 77 P.3d 319 (2003) (incorporating additional conditions for permanent placement proceeding).
[5] ORS 125.025(3)(L) authorizes appointment of a guardian with limited powers.
[6] Many of T's dependency proceedings also addressed the placement of one of T's siblings, K, who also has medical concerns. At the time of T's birth, mother had six other children, none of whom was in her care. Subsequently, only K has been returned to her. Only T is the subject of this proceeding.
[7] ORS 127.505(16) provides, in part:

"`Life-sustaining procedure' means any medical procedure, pharmaceutical, medical device or medical intervention that maintains life by sustaining, restoring or supplanting a vital function."
[8] See Troxel, 530 U.S. at 68, 120 S.Ct. 2054 ("[T]here is a presumption that fit parents act in the best interests of their children."); id. at 68-69, 120 S.Ct. 2054 ("[S]o long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children."); id. at 69, 120 S.Ct. 2054 (Washington law "contravened the traditional presumption that a fit parent will act in the best interest of his or her child"); id. at 70, 120 S.Ct. 2054 ("[I]f a fit parent's decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination."); id. at 100-01, 120 S.Ct. 2054 (Kennedy, J., dissenting) ("[A] fit parent's right vis-à-vis a complete stranger is one thing; her right vis-à-vis another parent or a de facto parent may be another.").