Argued and submitted July 19, order denying motion to dismiss jurisdiction affirmed; permanency judgment reversed and remanded November 15, 2012

In the Matter of M. D.,
a Child.

DEPARTMENT OF HUMAN SERVICES
and M. D.,
*Petitioners-Respondents*,

*v.*

J. N.,
*Appellant.*

Lane County Circuit Court 08286J;
Petition Number 08286J01;
A150405

291 P3d 765

Shannon Storey, Senior Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Inge Wells, Senior Assistant Attorney General, argued the cause for respondent Department of Human Services. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Ann Y. Lechman-Su argued the cause for respondent M. D. With her on the brief was Law Office of Ann Lechman-Su.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

In this juvenile dependency case, father appeals from a juvenile court order denying his motion to dismiss jurisdiction over his child, M, and a permanency judgment that changed the permanency plan for M to guardianship. Father contends that the basis for the court's jurisdiction no longer existed at the time of his motion to dismiss. Alternatively, father claims that the court erred by changing the permanency plan to guardianship rather than reunification. The Department of Human Services (DHS) maintains that jurisdiction is proper, but agrees with father that the proper permanency plan for M is reunification. M, however, argues that jurisdiction is proper and that guardianship is the appropriate permanency plan. We conclude that the court properly denied father's motion to dismiss jurisdiction. However, because evidence does not support the court's determination that M cannot be placed with father within a reasonable time, the court erred by changing the permanency plan to guardianship. Accordingly, we reverse and remand the permanency judgment.

The parties do not request *de novo* review and we decline to exercise it. *See* ORS 19.415(3)(b) (providing for discretionary *de novo* review of certain equitable actions); ORAP 5.40(8)(d) (setting forth a nonexclusive list of factors that govern the exercise of *de novo* review under ORS 19.415(3)(b)). We review the juvenile court's legal conclusions for errors of law, and we are bound by its findings of historical fact unless there is no evidence to support those findings. *Dept. of Human Services v. C. Z.*, 236 Or App 436, 442, 236 P3d 791 (2010).

The following facts are taken from the juvenile court's findings, as supported by evidence in the record, and supplemented with procedural or undisputed facts as needed. M was born in December 2002. Johnson, who was married to mother but was not cohabitating with her at the time of M's conception and birth, was listed on M's birth certificate as her legal father. *See* ORS 109.070(1)(b) (2003) (establishing a rebuttable presumption that a man married to a child's mother at the time of the child's birth is presumed to be the child's father). Johnson never had a relationship

with M, and the juvenile court entered a judgment of non-paternity in July 2009 declaring that Johnson was not M's legal father.

In April 2008, when M was five years old, DHS received reports that mother was using drugs and neglecting M and her half-siblings, A and Q,[1] and that domestic violence between mother and her boyfriend occurred in the children's presence. DHS placed the children in shelter care the following month and filed a petition for juvenile court jurisdiction because of mother's mental health issues and substance abuse and the children's exposure to domestic violence. M, A, and Q became wards of the court in July 2008 and were placed in DHS's legal custody. Initially, M and A were placed in the same foster home, and Q was placed elsewhere. M and A have always lived in the same home, and the trial court found that they are "significantly bonded."

Two years later, in June 2010, when M was seven years old, M, A, and Q were moved into foster care with A's paternal grandparents. Shortly thereafter, the court changed M's permanency plan from reunification to adoption. Two months later, DHS filed a petition to terminate mother's parental rights to M, A, and Q. *See* ORS 419B.504 (providing basis for termination of parental rights for unfitness). At that time, A's paternal grandparents were identified as the adoptive resource for all three children.

Father did not enter the picture until very recently, although he was aware of the possibility that he had a child with mother around the time of M's birth. Mother and father had a very brief relationship in 2002, but he moved to North Carolina shortly after meeting her and has lived there since. Mother telephoned him in 2002 to inform him that he had a daughter, but she called back a day later to retract her claim, asserting that Johnson was the father. In 2008, mother again telephoned father and informed him that he had a daughter in state custody in Oregon. Father reported that DHS also contacted him in 2008, informing him that Johnson was M's legal father and that he would need an attorney to establish paternity; father claimed that he lacked the finances to follow up at that time. Mother

---

[1] M, A, and Q have different biological fathers.

contacted father again in April 2010 and informed him that M was going to be adopted. DHS also contacted him again around the same time.

DHS paid for the paternity test that established in late August 2010, when M was seven years old, that father was M's biological father. DHS, through the Interstate Compact on Placement of Children, *see* ORS 417.200 - 417.260, requested a home study from a social services agency in North Carolina. That evaluation was conducted in late 2010 and early 2011 and resulted in a positive recommendation.[2]

Before the juvenile court entered a judgment of paternity under ORS 419B.395 establishing father's status as M's legal father, DHS filed a petition for jurisdiction, naming him as the putative father of M and asserting that the court retained jurisdiction over M because

"[t]he circumstances and conditions of [M] are such as to endanger her own welfare, in that:

"A. The putative father has failed to establish a relationship with the child, thereby failing to provide the child with the care, guidance and protection necessary for the child's physical, mental and emotional well-being. Therefore, Juvenile Court Jurisdiction is necessary to protect the child.

"B. The child is dependent for care and support on a public or private child caring agency that needs the services of the court in planning for the best interests of the child."

The court entered a judgment of paternity on December 17, 2010. Ten days later, father signed an admission that juvenile court jurisdiction was appropriate because

"[t]he father was unable to establish or maintain a relationship with the child which would allow him to act protectively on the child's behalf. The father does not have a custody order which would allow him to protect the child and is in need of juvenile court jurisdiction to protect the child."

---

[2] Father is married with two young sons. The home study revealed a stable family that presented as willing to assist M "with counseling or other needs as known or as they arise."

Based on that admission, the court entered a judgment of jurisdiction as to father. The court also ordered father to "[p]articipate in and successfully complete a comprehensive psychological evaluation with a DHS/CWP approved provider, by DHS/CWP, sign releases of information, and follow services recommended from the evaluation."

Father's first contact with M occurred in December 2010, the month she turned eight, when he visited her for a week at her foster parents' home in Oregon. Thereafter, father maintained telephone contact with M, although the frequency of that contact is disputed, and M visited father in North Carolina for several days in July 2011. During M's visit, father underwent a DHS-referred psychological and parent-child evaluation. The psychologist concluded that father did not suffer from any mental illness and that he had a "realistic" view of M, *i.e.*, that any transition would be difficult for M, and that father appeared to be prioritizing M's needs. Further, the psychologist indicated that father's ability to meet the needs of "a child transitioning from a familiar family environment into his home" was "good," and recommended that father and his wife undergo counseling to help them adjust to M moving in with them.

In March 2011, DHS moved to dismiss the petition to terminate mother's parental rights to M, asserting that adoption was no longer the appropriate plan. The trial court granted the motion and dismissed the petition.[3]

In October 2011, father moved to dismiss jurisdiction and terminate the wardship, asserting that the basis for jurisdiction—that he lacked a relationship with M and a custody order—no longer existed. He argued that he had established a relationship with M and that the only basis for jurisdiction left, the lack of a custody order, was not sufficient by itself to continue jurisdiction.

At a hearing in November 2011, the court denied father's motion to dismiss jurisdiction and terminate the wardship.[4] The court then held a permanency hearing, at

---

[3] Mother's parental rights to A and Q were terminated in April 2011.

[4] Mother did not appear at the permanency hearing and is not a party to this appeal.

which father and DHS asserted that the plan should be changed from adoption to reunification, while M argued that the plan should be changed to guardianship. DHS introduced several exhibits, including DHS's case plan, father's home study, an individual and sibling assessment of M by Strickland, a licensed clinical social worker, and father's court-ordered psychological and parent-child evaluation. M introduced letters from two of her teachers, a clinical summary of an assessment of her by a licensed marriage and family therapist, and a memorandum prepared by the Court Appointed Special Advocate (CASA). Only M testified at the hearing.

On December 7, 2011, the court entered a permanency judgment changing the permanency plan to guardianship. In that judgment, the court found that DHS had made reasonable efforts to reunify the family and that father had not made sufficient progress with M to safely place M with him within a reasonable time. The court ultimately determined that reunification was not appropriate on the ground that M could not be placed with father within a reasonable time because "to do so would very likely cause her severe mental and emotional harm." Instead, the court concluded that guardianship was better suited to "meet the health and safety needs of [M] including the need to preserve [M's] sibling attachments * * * and relationships."

Father appeals, raising four assignments of error. In his first assignment of error, father contends that the juvenile court erred in denying his motion to dismiss jurisdiction. His second assignment of error challenges the court's ruling that M's permanency plan at the time of the hearing was adoption. Finally, in his third and fourth assignments of error, father argues that the court erred in changing the permanency plan to guardianship. Father's second assignment of error is unpreserved, and we do not reach it. *State v. Wyatt*, 331 Or 335, 345, 15 P3d 22 (2000); ORAP 5.45. We first address the court's denial of father's motion to dismiss jurisdiction. Because we conclude that the court's denial of that motion was not in error, we then address the court's change of the permanency plan to guardianship.

ORS 419B.100(1)(c) grants the juvenile court "exclusive original jurisdiction in any case involving a person who is under 18 years of age and * * * [w]hose condition or circumstances are such as to endanger the welfare of the person or of others." "[F]or the juvenile court to have jurisdiction over a child pursuant to ORS 419B.100(1)(c), the child's condition or circumstances must give rise to a threat of serious loss or injury to the child." *Dept. of Human Services v. A. F.*, 243 Or App 379, 386, 259 P3d 957 (2011). That threat must be current and a preponderance of the evidence must support the conclusion that there is a reasonable likelihood that the threat will be realized. *Id.* The key inquiry is whether, under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child. *State ex rel Juv. Dept. v. T. S.*, 214 Or App 184, 191, 164 P3d 308, *rev den*, 343 Or 363 (2007).

As noted, the court found jurisdiction based on father's admission that

"[t]he father was unable to establish or maintain a relationship with the child which would allow him to act protectively on the child's behalf. The father does not have a custody order which would allow him to protect the child and is in need of juvenile court jurisdiction to protect the child."

Initially, father contends that there is no evidence that he is unable to act protectively and, therefore, the only basis for jurisdiction that remained in effect was his lack of a custody order. Father acknowledges that there is evidence that moving M out of her current placement to father's home in North Carolina may be "challenging" for her and might require professional intervention and assistance, but father claims that

"no party presented any evidence that father suffered from any deficits that would render him unable or unwilling to appropriately address [M's] need for counseling, render him unable to 'act protectively,' or that would otherwise expose [M] to a current threat of serious loss or injury[.]"

Therefore, father asserts that the only factual basis for jurisdiction that remained was his lack of a custody order, and, citing *State v. A. L. M.*, 232 Or App 13, 16-17, 220 P3d 449 (2009), he contends that the lack of a custody order by

itself is not grounds for jurisdiction. In sum, father contends that, at the time of his motion, neither his relationship with M nor his lack of a custody order posed a current risk of serious loss or injury to M.

DHS responds that father admitted that jurisdiction was necessary to protect M, that there is evidence in the record that the conditions giving rise to the wardship persisted, and that father's lack of a custody order continued to create a reasonable likelihood of harm to M. In particular, DHS notes that father lives in North Carolina and that, although he could have obtained a judgment in Oregon awarding him legal custody of M, he chose not to do so. Thus, DHS argues that, if the wardship were immediately terminated, M would be left in Oregon without a custodial parent and in the physical custody of foster parents who would have no legal right to make decisions about M's safety. Further, DHS maintains that the "mental health and social work professionals" involved in this case agreed that it would be in M's best interests to *gradually* transition to father's home. Accordingly, DHS insists that jurisdiction is required to assist in any transition to father's home and that the factual basis for jurisdiction remains.

M adopts DHS's argument and also contends that, "[r]egardless of *** father's general fitness to parent, jurisdiction was appropriate if father had not formed an emotionally protective relationship with [M] given her specific history of trauma, multiple moves and attachment needs[.]"

Under the totality of the circumstances as they existed at the time of father's motion, DHS established that there was a reasonable likelihood of harm to M's welfare such that it was not error to continue jurisdiction. M did not meet father until she was eight years old and had been in foster care for more than two years. Their relationship then consisted of two one-week-long visits and some telephone contact. M had lived her entire life with her sister, A, and is significantly bonded to her siblings, with whom she was currently placed. M strongly preferred to continue to live in her foster home and was not aligned with father. Further, there was evidence that a *sudden* transition from her current placement with her "psychological" grandparents and into

father's home could be harmful to M. Accordingly, because juvenile court jurisdiction is focused on the reasonable likelihood of harm to the welfare of *the child*, continued jurisdiction was appropriate given the combination of M's particular emotional needs, her background, and the lack of a parent-child relationship between M and father.[5]

We next evaluate the court's change of the permanency plan to guardianship. We begin with an overview of the applicable statutes. In general, ORS 419B.476 outlines the determinations that the juvenile court must make at the permanency hearing. Of particular relevance to this case, ORS 419B.476(5) requires the juvenile court to enter an order within 20 days of the permanency hearing that includes, among other things:

"(b)  The court's determination of the permanency plan for the ward that includes whether and, if applicable, when:

"(A)  The ward will be returned to the parent;

"(B)  The ward will be placed for adoption, and a petition for termination of parental rights will be filed;

"(C)  The ward will be referred for establishment of legal guardianship; or

"(D)  The ward will be placed in another planned permanent living arrangement;

"*****

---

[5] We also pause to note that *A. L. M.* does not dictate that in all circumstances the lack of a custody order alone is insufficient to support jurisdiction. In *A. L. M.*, jurisdiction originally had been asserted because the mother had neglected the child, the father's alcohol use endangered the child's welfare, and the father was unable to protect the child from the mother because he lacked a custody order. 232 Or App at 15. We concluded that jurisdiction was no longer proper once the father's alcohol issues were rectified, the father had physical custody of the child, and there was no evidence that the mother continued to represent a threat to the child's welfare in light of the father's circumstances. *Id.* at 17-18. There, the father had an existing relationship with the child, he had had physical custody of the child for several months, and there was no evidence in the record that the mother could use her legal custody to remove the child from the father's physical custody. Under those circumstances, therefore, there was no evidence that the lack of a custody order would expose the child to a reasonable likelihood of harm and continued jurisdiction was improper. *Id.* at 18. Accordingly, *A. L. M.* merely stands for the proposition that jurisdiction is not proper if the lack of a custody order would not expose the child to a reasonable likelihood of harm.

"(e)   If the court determines that the permanency plan for the ward should be establishment of a legal guardianship or placement with a fit and willing relative, the court's determination of why neither placement with parents nor adoption is appropriate[.]"

As noted, the juvenile court entered a permanency judgment that changed the permanency plan for M to guardianship. The court's decision to change the plan to guardianship was based on its conclusion that father had made insufficient progress and that "[M] cannot be reunited with her father at this time or within a reasonable period of time because to do so would very likely cause her *severe mental and emotional harm.*" (Emphasis added.) The court further explained that guardianship was the appropriate plan because

"[t]here are compelling reasons which have been documented why it would not be in the child's best interests to be returned home, placed for adoption, or placed in the legal custody of a fit and willing relative. The court finds compelling reasons exist based upon the lack of a relationship between the child and her father and in reliance on the professional opinions of the counselor who performed the comprehensive examination of all of the siblings; the opinion of the child's counselor; the opinion of the CASA; documentation within the exhibits received and the opinion of the child herself.

"The court finds that there are compelling reasons set forth herein, that support moving to this plan. The plan of guardianship allows the child to continue to establish a relationship with her father and his family throughout the rest of her minority, without separation from her siblings.

"* * * * *

"* * * This plan allows the father to continue to develop a relationship with the child. The plan allows the agency to find a permanent placement for all three siblings."

To summarize, pursuant to ORS 419B.476(5), the court concluded that guardianship was the appropriate permanency plan and that reunification with father was not

the appropriate plan because father had made insufficient progress to allow for reunification and, in addition, given the circumstances of this case, M's removal from her current placement and placement with father within a reasonable time would be inappropriate because it likely would cause M "severe mental and emotional harm." Father and DHS challenge the court's change of plan to guardianship.

Father argues that there was no evidence that he was unfit or that his progress was insufficient and that the court's change in permanency plan was erroneously based on its determination that it would be in M's best interests to make that change. DHS focuses on the court's determination that placement with father would cause M "severe mental and emotional harm" and contends that there is no evidence to support that determination. Ultimately, we agree with DHS and reverse on that basis.

DHS acknowledges that the evidence showed that M objected to any move to North Carolina and that she did not want to be separated from her siblings. Nevertheless, DHS contends that such evidence is insufficient to establish a reasonable likelihood that M would suffer "severe mental and emotional harm" if she were placed with father. DHS takes the position that

"[M] would be distressed by the move and would benefit from counseling to work through the adjustment process associated with it, [but] there is nothing in the record to suggest that her safety would be compromised, or that being placed with father would cause 'severe mental and emotional harm.'"

Accordingly, DHS claims that the court's determination of "severe mental and emotional harm" is not supported by the evidence and the court's legal determination that guardianship was the appropriate plan must be reversed.

M counters that the change of plan to guardianship was appropriate given father's lack of a "protective" relationship with M and evidence that removal from her siblings and placement with father would cause her severe

mental and emotional harm. She contends that father was unable to prioritize her needs over his own and that he failed to act protectively toward M's emotional safety and well-being. In particular, she points to the clinical assessment by Strickland that M had suffered significant trauma from "moves and losses" in her eight years and that any transition would be difficult and would require therapy and counseling.

We begin with the court's determination, under ORS 419B.476(5)(b) and (e), that M could not be placed with father within a reasonable time because she would likely suffer severe mental and emotional harm. We examine the record to determine if evidence supports that determination. *See C. Z.*, 236 Or App at 442. In reaching that determination, the court explicitly relied on M's testimony and several exhibits that were entered into the record, including an individual and sibling assessment of M, father's court-ordered psychological evaluation, a clinical summary of an assessment of M, and a memorandum prepared by the CASA.

First, we quote extensively from Strickland's individual and sibling assessment, which DHS sought in order to evaluate M's permanency needs. In her assessment, Strickland concluded that

> "[M] presented * * * as a child who has not yet recovered from her previous move a year ago. It is likely that [M] is having some reminders of how it felt to leave that home when she hears about a possible plan for moving to live with her dad in North Carolina. [M] expressed some alternating feelings during the assessment, saying she doesn't think about where she will grow up, she thinks 'nothing lasts forever', and remembering how * * * sad it was to leave her previous foster family. If possible, [M] would greatly benefit from having her foster home be a permanent placement, so she can use her current relationships to work through the grieving process of her previous attachments. Having a father in her life who wants a relationship is very important for [M], and it would benefit her if there was a way that she can build that connection without losing everything that is familiar to her."

In addition, Strickland noted that

> "[M] doesn't appear to have any behavioral issues or mental health issues at this time, and she appeared to be stable with

her mood, self esteem, and attachment skills at this time. She is vulnerable to developing anxiety or depression if she is not told fairly soon about what will be her permanent plan. At the time of the assessment, [M] talked about how she would be very sad if she moved, and she also seemed to have a sense that she doesn't have control over what happens to her, due to her past experiences.

"[M] has had many moves and losses in her eight years. * * * It is probable that [M] has layers of grief, and being stable for a year has helped her to begin processing some feelings about her past relationships. It is likely that [M] has complicated emotions about losing her mother, and she needs to have an opportunity to think about how that loss has impacted her life. It will be hard for her to do that when she is worrying about whether she will lose another family by moving away."

As for [M]'s bond with her half-siblings,

"[M] probably is not able to imagine being in a family without her older sister. It would be hard at her age to process the loss of a sister who has been a primary attachment figure, in addition to the loss of a birth mother, the loss of a foster family of two years, and the loss of psychological grandparents who have cared for her as parents for one year. [M] would likely have a complicated grieving process if she were to move far away by herself, and working through her past relationships could significantly impact her ability to make new attachments."

In addition, when asked to assess [M]'s transitional needs if she is moved and, if possible, father's ability to meet those needs, Strickland indicated that

"[father] was interviewed briefly by phone, but it isn't possible to assess his ability to meet [M's] needs, without the full information about his psychological testing and parent child interaction * * *. By phone, [father] was talkative and willing to focus on [M's] needs and feelings about the visit. He sounded empathic by phone and eager to do what was necessary to complete the process and have his daughter live with him.

"Although [M] isn't currently displaying any obvious behavioral or emotional problems in her home, it would be a mistake for any adult to assume that she will easily transition and adjust into a new environment. [M] has

been involved in the foster care system since 2008 and she has experienced multiple moves. She does not have a clear resolution to the relationship with her biological mother, and her history indicates she has primarily relied on her older sister for care giving probably since infancy. During this assessment, she displayed signs of grief about the loss of her family one year ago, and her foster parent reported that [M] cries at night.

"If [M] were separated from her current family, she would need her new parents to fully acknowledge to [M] that her losses are very important to them. New parents would need to help [M] understand that they want to show her feelings, no matter what they are. [M] will need to have time to build trust in new caregivers, and this can take at least one year for children who have a history of previous moves. [M] will also need to have some consistent weekly therapy that is focused on building family relationships but also helping [M] to resolve all of the changes that have occurred since she came into foster care. [M] has an unknown history of trauma, and it is possible that if she were to move into a new home, she would need to process her memories and worries with her new parents.

"*** [M] would need to begin some therapy even if she is not displaying behavioral problems. [M] would need to have clear information about what the rules, chores, and consequences are in the new home. Her new parents would need to have appropriate expectations that even though [M] is fairly compliant in her current home, it would be normal for her to test limits and boundaries in a new environment."

A brief clinical summary by the therapist who evaluated [M] in January 2011 concluded that M's removal from A and Q may have "unfavorable psychological effects upon [M]" that would require "mental health counseling and support services[.]" The therapist also noted that "the lack of current symptoms [of stress and anxiety] may be evidence of current relational bonds via, structure, stability and support in current foster placement with biological family."

M testified about her wish to stay in her current placement, her bond with A, and that she considered her foster parents her grandparents.

Finally, father's psychological evaluation did not result in a diagnosis of any mental illness and established the lack of any background of treatment for mental illness or substance abuse. Moreover, the psychologist indicated that father appeared to have a realistic view of M, in that he realized that any transition to North Carolina would be difficult and would require patience. The psychologist also concluded that father's ability to "meet the needs of a child transitioning from a familiar family environment into his home" was "good" given the actions that he had already taken (including parenting classes by father and his wife) and his willingness to participate in future family therapy, classes, or "'whatever is needed'" in order to make the transition positive.

We conclude that the record lacks evidence that placement with father within a reasonable period of time would likely cause M "severe mental and emotional harm." The evidence that directly addressed M's mental and emotional needs indicated that a transition out of her current placement and away from her half-siblings would be very difficult and would likely result in a "complicated grieving process" or "unfavorable psychological effects" that would require consistent mental health counseling and support services even if M was not displaying behavioral problems. The mental health professionals also opined that it would "greatly benefit" M to remain in her current placement and that the stability in her current placement could be part of the reason that she presented without behavioral or mental health issues. Nevertheless, Strickland in particular noted that, if M was placed in father's care, father and his family would need to have appropriate expectations and patience with M to help her work through her losses and past trauma—and though Strickland did not have the benefit of father's not-yet-completed psychological evaluation, the resulting evaluation indicated that father presented as someone who could meet M's transition needs and that he had a realistic view of M and the difficulty that any such move would pose for her.

Taken together, the record does not support the juvenile court's determination that placement with father within a reasonable time would cause M severe mental and emotional harm. Although there was evidence that any transition would be very difficult and would require

services for M and father, that prospect is not unlike the circumstances in most dependency cases where a change in placement will be difficult for the child. Nothing in this record shows a reasonable likelihood that placement with father within a reasonable time would cause M to suffer effects that rise to the level of "severe mental and emotional harm." Strickland's assessment, particularly when viewed in light of father's psychological evaluation, does not support juvenile court's finding of "severe mental and emotional harm." Because that finding is the basis of the court's determination that guardianship was the appropriate permanency plan and that return to father was not appropriate, we reverse the permanency judgment.

Order denying motion to dismiss jurisdiction affirmed; permanency judgment reversed and remanded.