Submitted March 1, affirmed August 14, petition for review denied
November 27, 2013 (354 Or 290)

In the Matter of A. R. C.,
a Minor.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

D. W. C.,
*Appellant.*

Wasco County Circuit Court
J10023;
Petition Number J1002301;
A152677

308 P3d 316

Peter Gartlan, Chief Defender, and Kimberlee Petrie Volm, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Jake J. Hogue, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

EGAN, J.

**EGAN, J.**

In this juvenile dependency case, father appeals from a permanency judgment that changed the permanency plan for his daughter, A, from reunification to guardianship. Father contends that the juvenile court erred in concluding that his progress in establishing a relationship with A was insufficient and thus erred in changing the permanency plan for A.[1] The Department of Human Services (DHS) maintains that the juvenile court did not err in concluding that father made insufficient progress, and therefore did not err in changing A's permanency plan from reunification to guardianship. For the following reasons, we affirm.

## I. STANDARD OF REVIEW

The parties do not request that we exercise our discretion to review this case *de novo*, ORS 19.415(3)(b), and we decline to do so. *See* ORAP 5.40(8)(c) (we exercise *de novo* review "only in exceptional cases"). Accordingly, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's [determination] and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013).

## II. FACTS

We recite the facts consistently with the juvenile court's expressed and implied findings, supplemented by uncontroverted information in the record. A was seven years old at the time of the permanency hearing. She had been living with mother and stepfather in Oregon; father lived in Oklahoma. In May 2010, when A was 5 years old, DHS learned that mother had bitten A's arm, causing injury, and that mother and stepfather were abusing methamphetamine. DHS took custody of A and petitioned the juvenile court to assert jurisdiction over A on the following bases:

---

[1] ORS 419B.476(2)(a) provides, in relevant part, "If the case plan at the time of the [permanency] hearing is to reunify the family, [the court shall] determine * * * whether the parent has made sufficient progress to make it possible for the ward to safely return home."

"A)  [A]'s mother * * * has inflicted injuries on [A] leaving significant bruises.

"B)  [A]'s mother['s] * * * use of controlled substances and/or alcohol affects her ability to adequately parent [A], placing [A] at risk of harm.

"C)  [A]'s mother * * * leads a chaotic and unstable lifestyle, placing [A] at risk of harm.

"D)  [A]'s father * * * knew or should have known [A] was at risk of harm and he failed to take steps to adequately protect [A]. *In addition, he has had limited contact with [A] for an extended period of time.*

"E)  The totality of the circumstances is such as to endanger the welfare of [A]."

(Emphasis added.) In May 2010, the juvenile court took jurisdiction over A on the grounds set forth above. The initial permanency plan instituted by DHS was reunification with family. A has been in relative foster care since DHS took custody of her in May 2010.[2]

After the court took jurisdiction, father continued to live in Oklahoma. He had never met A before she entered DHS custody. Father has sustained a head injury that renders him unable to work; he receives ongoing disability benefits for that condition. At the permanency hearing, the juvenile court ordered father to submit to a psychological examination in order to learn more about the effects of his head injury and the resulting disability. At least two psychological evaluations were scheduled, but father failed to attend them.

DHS requested an evaluation of father under the Interstate Compact for the Placement of Children (ICPC) in November 2010. After the ICPC evaluation, father was approved as a placement source contingent on father establishing a relationship with A, and DHS communicated that information to him in April 2011.

---

[2] A was placed in foster care with her younger half-sister. Since her younger half-sister's birth, she and A have always resided together.

In June 2011, father visited A in Oregon. There was some confusion regarding the dates and times of the trip. Father ultimately cut the visit short and returned to Oklahoma after spending a few days visiting A. Between June and October, father occasionally called A on the telephone. Despite the encouragement of A's foster mother and DHS, father stopped calling because he felt it was too difficult and traumatizing for A.

For the following eight months, father had no contact with A. On May 1, 2012, DHS sent father a letter offering to pay for bus tickets and lodging in Oregon in an effort to help him build the paternal relationship. Father did not respond to that offer.

A struggles academically, socially, and behaviorally at school. She has difficulty processing information, is forgetful, has attention problems, and is easily confused. She has historically had problems with purging her food after meals, and she must be monitored to prevent her from doing so. A requires constant care and must be closely supervised because she is sexually aggressive and physically violent with other children. A has hit a dog on the head with a brick and tried to suffocate small animals on multiple separate occasions.

In July 2012, the juvenile court held a permanency hearing at which DHS sought to modify A's permanency plan from reunification to guardianship.[3] At the hearing, father testified that he had never received the letter offering to pay for a trip for him to visit A and said that he wanted to come to Oregon for an additional visit. Father acknowledged that he did not have a good understanding of A's needs and that his only familiarity with her needs was from what he had read in reports. Father testified that he lives in a home with three other children and that there is a fourth child who visits the home regularly. When asked what the risk to the children living in his home would be if A was not properly supervised, father responded that there would be no risk, explaining:

---

[3] At the permanency hearing, both A and A's mother supported the change in permanency plan.

"I don't see her—they're all either at the same age or older than her. I don't see her physically injuring any of them. I also—I don't see them forcing them any kind of sexual things, because they are all—so I think the risk would be a minimum. * * * I just don't see something like that being a problem."

Father acknowledged that he would not be able to provide "line-of-sight" supervision to A.

Father found two schools in Oklahoma that provide schooling for children with special needs. The programs in those schools offer the necessary "line-of-sight" supervision, speech therapy, and individualized education programs.

The juvenile court continued the permanency hearing from July 2012 until September 2012. Between those two hearings, father rented a car and traveled to Oregon with his mother, his brother, and A's biological brother. The family visited A. She initially demonstrated some confusion and nervousness, but, as the visit continued, she opened up to her father and other relatives. Following her visits with father and his family, A's behavioral problems escalated. As a result, she slept in bed with her foster parents for a period of time. Despite opening up to her father, A remained confused about whom she would be visiting and about her relationship to father. A also had to be reminded each day that she was visiting with her father.

After that visit, father contacted A by telephone twice, which was less often than he had said that he would contact her. Father also sent her a "picture packet" of his family in Oklahoma. The DHS permanency supervisor expressed disappointment in father's lack of contact and follow through after his visit.

After the visit, when the permanency hearing resumed in September 2012, DHS reiterated its intention to change A's permanency plan from reunification to guardianship. DHS noted that mother and stepfather agreed with the proposed change. DHS contended that, despite its reasonable efforts, father had failed to make sufficient progress for A to be returned to his care within a reasonable time. DHS

explained that, in the two and a half years that A had been in DHS custody, father had visited her twice and spoken with her on the phone a few times. DHS further explained that father had failed to undergo the psychological evaluation and been hesitant to discuss his head injury despite DHS's efforts to ascertain how that injury might affect his ability to parent A. DHS contended that A needed the stability that guardianship would provide and that the actions that father had taken were insufficient to establish a relationship with A. DHS explained that, due to A's significant needs, A needed permanency as soon as possible, and that, if she were left waiting to see where she would grow up, it was unlikely that A's behavioral and emotional functioning would progress.

DHS presented evidence that, due to A's special needs, she would require a very slow, well-planned transition so that she would not engage in behaviors that are dangerous to herself and others. DHS also presented evidence that separating A from her younger half-sister would be detrimental to A, due to their close sibling bond. Further, DHS offered evidence that A would suffer negative effects if she were separated from her mother, stepfather, and foster parents, because they have an established relationship. DHS explained that it had attempted over the past two years to build the relationship between A and father, so that they could avoid an inadequate transition and avoid placing A at risk of suffering developmental regression, increased anxiety, and increased dangerous behaviors.

Father responded that, although he has had trouble staying in contact, he has always been eager to know what he should be doing. He essentially argued that he was uninformed about what he should be doing to establish a relationship with A and that he lacked the resources to make establishing a relationship a possibility. Father argued that there was no evidence in the record that harm would come to A if she were placed with him or that she was incapable of adjusting to change.

The juvenile court concluded that DHS had made reasonable efforts to reunify the family and that father had not made sufficient progress to establish a relationship with

A. The court explained that father had met with A twice throughout the entirety of her life and that father had failed to remain in contact with A via telephone or other medium. The court acknowledged father's two visits, noting that one visit was cut short, and that telephone visits were discontinued, "[a]nd even given those opportunities, he still was [un]able to establish a relationship with his daughter." The court found that father lacks understanding of A's "significant deficits" and determined that "[father] does not have a good understanding of [A]'s problems that are unique to her." The court also noted that father lacked an understanding that "tearing this little girl away from the family that she knows, especially given her particular situation, would be devastating * * *." The court concluded that A needs "extensive supervision, due to engaging in dangerous behavior[.]" The court determined that A could not be returned to father "because he has not established a connection with his daughter." Based on those findings, the court changed the permanency plan from reunification to guardianship.

## III.  ANALYSIS

On appeal, father contends that DHS did not prove that his progress toward ameliorating the bases for dependency jurisdiction was insufficient to allow A's commitment to his care.[4]

ORS 419B.476(2)(a) provides that, at the permanency hearing, the juvenile court's role is as follows:

"If the case plan at the time of the hearing is to reunify the family, determine whether [DHS] has made reasonable efforts * * * to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home.

---

[4] Father initially argued that the juvenile court erred because it did not assess whether A could be returned to his care within a reasonable time. In subsequent briefing, father notes that we need not reach that issue. Pursuant to our holding in *Dept. of Human Services v. D. L. H.*, 251 Or App 787, 805, 284 P3d 1233, *adh'd to as modified on recons*, 253 Or App 600, 292 P3d 565 (2012), if a court decides to change a permanency plan from reunification, ORS 419B.476(2)(a) does not require that the court make a finding in the judgment that the child cannot be reunited with the parent *within a reasonable time*.

In making its determination, the court shall consider the ward's health and safety the paramount concerns."

Thus, to change the permanency plan from reunification to guardianship, a court must find that, despite DHS's reasonable efforts to reunify the family, the parent has not made sufficient progress for the child to be returned to the parent. *State ex rel Dept. of Human Services v. S. L.*, 211 Or App 362, 372, 155 P3d 73 (2007).

The determination of whether a parent has made sufficient progress is measured in the context of the factual bases for jurisdiction as set forth in the jurisdictional judgment. *Dept. of Human Services v. C. L.*, 254 Or App 203, 213, 295 P3d 72 (2012), *rev den*, 353 Or 445 (2013). Therefore, in order to change a permanency plan from reunification to another permanent plan, a court must find both that DHS made reasonable efforts towards reunifying the family and that the parent has not made sufficient progress in ameliorating the barrier to reunification that is identified in the jurisdictional judgment. *C. L.*, 254 Or App at 213.

We have held that "a parent's '[m]ere participation in services *** is not sufficient to establish adequate progress toward reunification.'" *Dept. of Human Services v. N. S.*, 246 Or App 341, 351, 265 P3d 792 (2011), *rev den*, 351 Or 586 (2012) (quoting *S. L.*, 211 Or App at 372) (brackets in *N. S.*). The court must take into consideration whether a parent has attempted to make appropriate changes and whether he or she has ignored or refused to participate in plans suggested or required by the state. *State ex rel Juv. Dept. v. K. D.*, 228 Or App 506, 514, 209 P3d 810 (2009). The primary concern in changing the permanency plan from reunification with the parent is always the child's health and safety. ORS 419B.476(2)(a); *see State ex rel Dept. of Human Services v. Shugars*, 208 Or App 694, 712, 145 P3d 354 (2006).

On appeal, father does not argue that DHS's efforts to reunify the family were unreasonable. Therefore, the issue to be resolved is whether the juvenile court erred in determining that father has not made sufficient progress in ameliorating the barrier to reunification that is identified

in the jurisdictional judgment to make it possible for A to safely return home.

DHS asserts that evidence in the record is legally sufficient to support the juvenile court's conclusion that father had failed to make sufficient progress, such that A cannot safely be placed with father because father lacks a significant relationship with A and lacks insight into A's special needs. DHS also contends that father's attempts to strengthen his relationship with A in the weeks preceding the hearing were inadequate.

As previously noted, the juvenile court asserted dependency jurisdiction over A with regard to father based on the following facts:

"D) [A]'s father * * * knew or should have known [A] was at risk of harm and he failed to take steps to adequately protect [A]. *In addition, he has had limited contact with [A] for an extended period of time.*

"E) The totality of the circumstances is such as to endanger the welfare of [A]."

(Emphasis added.)

As A was in foster care at the time of the permanency hearing, father's failure to protect A from mother was not directly at issue. Thus, the relevant jurisdictional basis was father's "limited contact with [A] for an extended period of time" which led, in part, to the "totality of the circumstances" that "endanger[ed] the welfare of [A]." Father acknowledges his continuing lack of a connection and limited relationship with A. In making its determination of insufficient progress, the juvenile court relied on father's continued limited contact with A, finding that father had visited with A only twice during the two years that she had been in DHS custody. Father testified that the visit in June 2011 was the first face-to-face contact that he and A had ever had. The juvenile court also relied on the limited telephone contact between father and A. After the June 2011 visit, father occasionally called A on the telephone, but discontinued those telephone calls in October 2011. Father testified that he voluntarily stopped calling her, despite the encouragement of A's foster mother and DHS, because he thought that the

telephone calls were causing A stress. When father visited A in August 2012, A had not seen father in at least 13 months, and A had not spoken with father on the telephone in 10 months. Further, the court found that, following the visit in August 2012, father called A only four times, and that each call lasted only a few minutes.

In determining that father had made insufficient progress, the court also relied on father's lack of understanding of A's needs due to the lack of relationship. The court determined that father "did not take very many steps" toward establishing a connection with A and also failed to fully appreciate the depth and severity of his daughter's psychological disorders. As part of the support for the juvenile court's determination, DHS points to father's testimony that he did not have a full understanding of A's needs and that he needed to be around A more to learn about her day-to-day needs. Father was put on notice in 2010 that A was in DHS custody and that he would have to establish a connection with A in order to remove the basis for DHS's jurisdiction over A—*i.e.*, the limited contact. Father's ICPC home study evaluation provided that he was a suitable home placement for A, contingent on father establishing a relationship with A. Even after being notified that A was in DHS custody in 2010, it took father over a year to visit the first time, and another year to visit a second time. DHS also explained that, due to A's significant needs, A needed permanency as soon as possible, so that she could continue to make progress regarding her behaviors and emotional functioning.

As noted, we review the evidence in the light most favorable to the trial court's determination and assess whether, when so viewed, the record was legally sufficient to permit the court's determination that father had made insufficient progress. *N. P.*, 257 Or App at 639-40 (2013). Here, as demonstrated above, the record supports the court's conclusion that father had failed to make sufficient progress in ameliorating the jurisdictional basis of limited contact which persisted at the time of the hearing, to allow for A to safely return home.

Father asserts that *Dept. of Human Services v. J. N.*, 253 Or App 494, 509-11, 291 P3d 765 (2012), *rev den*,

353 Or 747 (2013), supports his argument that the juvenile court erred when it determined that he had made insufficient progress, because, he argues, DHS was required to prove both that the particular areas of parental unfitness identified in the jurisdictional judgment persisted at the time of the hearing and that they would cause A significant mental or emotional harm. Father's reliance on *J. N.* is inapposite here. In *J. N.*, we reversed a change in permanency plan from reunification to guardianship. *Id.* at 496. The juvenile court had found that the child could not be reunited with the parent "at this time or within a reasonable time because to do so would very likely cause [the child] *severe mental and emotional harm.*" *Id.* at 504 (emphasis in original). In reversing, we stated:

> "Taken together, the record does not support the juvenile court's determination that placement with father within a reasonable time would cause [the child] severe mental and emotional harm. * * * Because that finding is the basis of the court's determination that guardianship was the appropriate permanency plan and that return to father was not appropriate, we reverse the permanency judgment."

*Id.* at 509-10. The juvenile court had made a determination regarding the sufficiency of the father's progress and made a finding that the child would suffer severe harm to support its decision to change the plan. However, we concluded that there was no evidence in the record to support the finding on which the trial court relied. Here, as discussed above, the evidence in the record supports the juvenile court's determination that A could not safely be returned to father's care.

To the extent that father relies on *J. N.* to assert that the trial court erred because A's health and safety is no longer endangered, we reject father's argument. Implicit in the juvenile court's conclusion that father had made insufficient progress is a conclusion that the danger that existed to the child when dependency jurisdiction was established in 2010 still existed at the time of the permanency hearing.

Finally, we briefly address father's additional assertion that is based, in part, on his first argument. Father asserts that DHS was required to prove that "father's limited relationship with [A] rendered him unfit, *i.e.*, exposed

[A] to a current and ongoing safety threat," and that it did not do so. Thus, father contends, he "was entitled to the presumption that his decision to have [A] in his care and custody was in her best interest." Father relies on ORS 419B.090(4),[5] *Dept. of Human Services v. J. R. F.*, 351 Or 570, 273 P3d 87 (2012), and *Troxel v. Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000), as support for that proposition.

Father's constitutional assertion is foreclosed by our resolution of father's first argument and by this court's rejection of a similar argument in *Dept. of Human Services v. S. M.*, 256 Or App 15, 24-29, 300 P3d 1254, *rev allowed*, 353 Or 867 (2013).

In *S. M.*, we reviewed *State ex rel Juv. Dept. v. Smith*, 205 Or App 152, 166, 133 P3d 924 (2006), and *O'Donnell-Lamont and Lamont*, 337 Or 86, 91 P3d 721 (2004), which applied the United States Supreme Court's decision in *Troxel* and noted that, although a parent has a right to make decisions related to his or her child, that right is not absolute, but instead is a basis for a presumption that a "fit" parent acts in the best interest of his or her child. *S. M.*, 256 Or App at 26-27.

In *S. M.*, the juvenile court asserted dependency jurisdiction over the parents' eight children, and DHS sought to immunize the children over the parents' religious objections. We analyzed whether a parent retains his or her right to make decisions regarding the upbringing of his or her children notwithstanding the fact that the juvenile court has properly asserted dependency jurisdiction over the parent's children and has taken custody of them. *Id.* at 24. We concluded that the parents were alleged to be unfit, because,

[5] ORS 419B.090(4) provides, in relevant part:

"It is the policy of the State of Oregon to guard the liberty interest of parents protected by the Fourteenth Amendment to the United States Constitution * * *. The provisions of [ORS chapter 419B] shall be construed and applied in compliance with federal constitutional limitations on state action established by the United States Supreme Court with respect to interference with the rights of parents to direct the upbringing of their children, including, but not limited to, the right to:

"(a) Guide the secular and religious education of their children;

"(b) Make health care decisions for their children; and

"(c) Discipline their children."

at the time of the court's decision, the parents had lost both guardianship and legal custody of their children in a juvenile dependency proceeding. We concluded that, because there was evidence to support the juvenile court's conclusion that the parents were unfit, *S. M.* was distinguishable from *Troxel*, and therefore the right of "fit" parents to make decisions regarding the care, custody, and control of their children was not implicated. *S. M.*, 256 Or App at 21, 27-28.

In this case, DHS became involved in the family's affairs when A was taken into DHS custody, and the juvenile court took jurisdiction in 2010. DHS has alleged and proved that father is not "fit" based on the fact that dependency jurisdiction had been established, A has been in DHS custody for over two years, and, thus, that the factual basis specified in the jurisdictional judgment—*i.e.*, a lack of contact—persists. We have already determined that the trial court did not err in concluding that the jurisdictional basis persists and thus father made insufficient progress towards reunification. Therefore, we reject father's argument that he was entitled to the presumption that his decision to have A in his care and custody was in her best interest.

In sum, we conclude that the record supports the juvenile court's conclusion that father made insufficient progress in establishing contact with A, that father was not entitled to a presumption that he acts in the best interests of A, and that the juvenile court did not err in changing the permanency plan from reunification to guardianship.

Affirmed.