110　　　　　February 20, 2025　　　　　No. 124

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of K. A. O.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*
S. E.,
aka S. M.,
aka S. M.,
*Appellant.*

Crook County Circuit Court
22JU01495; A183994 (Control)

In the Matter of J. E., Jr.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. E.,
aka S. M.,
aka S. M.,
*Appellant.*

Crook County Circuit Court
22JU01496; A183995

In the Matter of C. I. C.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*
S. E.,
aka S. M.,
aka S. M.,
*Appellant.*

Crook County Circuit Court
22JU01497; A183996

John L. Collins, Judge.

Argued and submitted November 5, 2024.

Sarah Peterson, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Oregon Public Defense Commission.

Robert C. Hansler, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, Hellman, Judge, and Mooney, Senior Judge.

HELLMAN, J.

Judgments in case numbers 22JU01497 and 22JU01495 reversed and remanded; judgment in case number 22JU01496 affirmed.

**HELLMAN, J.**

Mother appeals three dependency judgments that changed the permanency plans of her children, C, K, and J, away from reunification. On appeal, mother raises six assignments of error. In her first four assignments of error, mother argues that the juvenile court erred when it changed K's and J's plans away from reunification because the Department of Human Services (DHS) failed to establish that she had made insufficient progress toward reunification with those children. In her fifth and sixth assignments of error, mother argues that the juvenile court plainly erred when it changed C's and K's permanency plans to "placement with a fit and willing relative." We conclude that the juvenile court did not err when it concluded that mother had made insufficient progress and when it changed K's and J's permanency plans away from reunification. However, we conclude that the juvenile court plainly erred when it changed C's and K's permanency plans to "placement with a fit and willing relative" because its determination was based on DHS's misrepresentation of the applicable law. We elect to exercise our discretion to correct the plain error and reverse and remand the permanency judgments with respect to C and K. We otherwise affirm.

Mother does not request *de novo* review and we decline to exercise our discretion to do so. *See* ORAP 5.40(8)(c) (providing that we exercise our discretion to review *de novo* "only in exceptional cases"). Consequently, "we consider the evidence in the light most favorable to the juvenile court's disposition to determine whether it supports that court's legal conclusions." *Dept. of Human Services v. Y. B.*, 372 Or 133, 136, 546 P3d 255 (2024). We state the facts accordingly.

In May 2022, the juvenile court found C, K, and J within its jurisdiction. The children were eight, seven, and three years old, respectively. With respect to each child, mother admitted to the jurisdictional bases that she "is unable, at this time, to meet the child's needs, including treatment and care for mental health, behavioral, and hygiene needs" and that she "suffers from mental health issues that impair her ability to safely parent the child, resulting in exposing the child to unsafe people and situations."[1]

---

[1] The record indicates that neither C's nor K's father could serve as a parental resource and that J's father is deceased.

After entering DHS custody, C and K both told DHS that mother's boyfriend, Terp, had sexually abused them and that they feared him. DHS determined that allegations that Terp had physically abused and neglected the children were founded. Although mother consistently denied that she was in a relationship with Terp, in January 2024 mother admitted that the relationship had continued.

In February 2024, DHS "request[ed] a change of plan to [a] fit and willing relative for [K] and [C], along with a change of plan to adoption for [J]." At the time, C and K were placed in separate group homes for children with intellectual and developmental disabilities (IDD) and J was in non-relative foster care.

At the contested permanency hearing, the juvenile court heard testimony concerning the foregoing facts. Mother testified that she and Terp lived in a trailer that lacked a bathroom or running water. Mother stated that she had "no mental issues," that she was "an angry person" because she did not have her children, and that she wanted K and J returned to her care. Although mother acknowledged that C and K had "emotional and mental disabilities that need to be taken care of" and that K ran away from caregivers, mother stated that she planned to homeschool K. Mother further testified that she believed that J's "behaviors are normal" and that she intended to relinquish her parental rights to C because C had made "previous accusations that were all founded to be untrue."

A caseworker testified that mother did not understand the children's needs and that she could not care for them. For example, the caseworker testified that K had received numerous mental health diagnoses, had "extremely violent episodes," and used objects as weapons. The caseworker also testified that J had exhibited "aggressive" conduct and had "been escalating in behaviors," but that mother had "no game plan or insight on where these behaviors are coming from or how to mitigate them safely." When mother missed visits with J, he had "outbursts" in which he "[y]ells, screams, hits *** [and] damages the resource parents' home." The caseworker further testified that although mother had completed parenting classes and a mental

health assessment, she had completed only "some" mental health sessions.

The caseworker testified that DHS had not identified relatives who could serve as permanent placements or any adoptive resources for C or K. However, the caseworker explained that changing their permanency plans to placement with a "fit and willing relative" "would allow the children to remain in their IDD homes *** and the agency is classified as a fit and willing relative, so they'll be able to stay there until they're 21 years old, and they would remain in our system."[2] The caseworker further testified that a paternal relative of J's wanted to serve as J's adoptive resource and that the relative had completed a home study.

In its closing argument, DHS argued that the proposed plan was appropriate for C and K because "there is not a good enough indication right now as to what each child's *** needs are going to look like as they get older." As a consequence, DHS asked the court to order C and K placed with "a fit and willing relative" within a year.

"THE COURT:   What would that look like for [C and K]?

"[DHS]:   A fit and willing relative for them? So it could either look like them remaining in a group home, because that satisfies the definition of a fit and willing relative, where they are located, so long as that home is meeting all of their needs, or it could be a [Greater Oregon Behavioral Health] placement, or more of an IDD foster placement. So that would be a typical resource home that the Court would see. It could also, down the road, like I had indicated, if changes are made, we could revisit placement and have an in-home potentially with [mother], should she meet the conditions for return at some point in the future. Fit and willing relative allows some flexibility in that regard."

The juvenile court concluded that mother had made insufficient progress toward ameliorating the jurisdictional bases. Specifically, the juvenile court found that mother displayed "ambivalence about her need to protect the children from any potential abuse that may—that according to her

---

[2] In its answering brief, DHS represents that "the caseworker misspoke" when she "stated that 'the agency is classified as a fit and wiling relative.'"

testimony now, didn't happen," that mother had failed to establish "a safe environment," and that mother needed to engage in additional mental health treatment. The following exchange then occurred:

> "THE COURT:   So, let's see if I've got this right. I am authorizing the change of plan with regard to [J] to guardianship.

> "And now, this is where I struggle with the exact terminology. *** [H]ow should I phrase this, to maintain essentially the things going in the same—the direction that they're headed with regard to [K] and [C]? That's the fit and willing—

> "[DHS]:   Relative.

> "THE COURT:   —relative, and that fit and willing relative can be an IDD placement, am I right?

> "[DHS]:   Yes.

> "THE COURT:   Okay. So that's pretty important in this case, because I see that as being a good, from what I can see, a good option, especially for [C]."

Following the hearing, the juvenile court changed each child's permanency plan away from reunification. As to C and K, the juvenile court "determine[d] the permanency plan will be placement with a fit and willing relative." The juvenile court ordered C and K "be placed with a fit and willing relative by [March 30], 2025." In addition, the court changed J's plan to permanent guardianship, rather than adoption as DHS requested. This appeal followed.

In her first four assignments of error, mother argues that the juvenile court erred when it concluded that her progress toward reunification with K and J was insufficient and when it changed their permanency plans away from reunification.[3] Specifically, mother argues that DHS failed to establish that she had made insufficient progress because "mother had identified options to care for the children without Terp," and because she "expressed willingness to accede to the department's demands to achieve reunification with

---

[3] Mother does not challenge the juvenile court's conclusion that she made insufficient progress toward reunification with C or its determination that C's permanency plan should be changed away from reunification.

[K] and [J]." The state responds that mother did not preserve those sufficient progress arguments and, in any event, that the evidence supports the juvenile court's determinations. Assuming, without deciding, that mother's arguments are preserved, we conclude that the juvenile court did not err.[4]

A "juvenile court's 'determination' of sufficient progress is a legal conclusion that this court reviews for errors of law." *Y. B.*, 372 Or at 149.

> "[I]n reviewing a juvenile court's determination to change a permanency plan because a parent has not made 'sufficient progress' to allow a child to safely return home, appellate courts are bound by the juvenile court's factual findings as to what efforts DHS has made and what actions the parent has taken, so long as there is any evidence in the record to support them, and we assume that the juvenile court found all facts necessary to its ruling, even if it did not do so explicitly."

*Id.* at 151. "DHS bears the burden of proof at a permanency hearing, and it must prove the facts supporting a change to the permanency plan by a preponderance of the evidence." *Id.* at 135 (citing ORS 419B.476(1)). "The 'progress' that a parent must make is in ameliorating, to the extent necessary to make possible the child's safe return to the parent's care, the circumstances that led the juvenile court to make the child a ward of the court." *Id.* at 146. Moreover, a juvenile court "must take into consideration whether a parent has attempted to make appropriate changes and whether he or she has ignored or refused to participate in plans suggested or required by the state." *Dept. of Human Services v. D. W. C.*, 258 Or App 163, 171, 308 P3d 316, *rev den*, 354 Or 490 (2013).

We conclude that the evidence was legally sufficient to support the juvenile court's conclusion that mother had made insufficient progress toward ameliorating the first jurisdictional basis, that mother is "unable *** to meet the child's needs, including treatment and care for mental health, behavioral, and hygiene needs." Even though

---

[4] Because mother does not challenge the juvenile court's conclusion that DHS made reasonable efforts, the issue before us is whether the juvenile court erred when it concluded that mother's progress was insufficient to permit reunification.

K had "extremely violent episodes" and ran away from her caregivers, the record indicates that mother "[did] not have any additional safety plan in place for [K]" and intended to homeschool her. In addition, even though J had exhibited "aggressive" conduct and had "been escalating in behaviors," the court heard testimony that mother had "no game plan or insight on where these behaviors are coming from or how to mitigate them." In fact, mother testified that she wanted J returned to her care that day. Finally, although K had told DHS that Terp had sexually abused her and that she feared him, mother testified that she did not believe that Terp had abused any of her children, that she lived with Terp, and that their residence lacked a bathroom or running water. Thus, the foregoing evidence permitted the juvenile court to conclude that mother had made insufficient progress toward ameliorating the first jurisdictional basis.

The evidence was also legally sufficient to support the juvenile court's conclusion that mother had not made sufficient progress with respect to the second jurisdictional basis, that her "mental health issues * * * impair her ability to safely parent" K and J. At the contested hearing, mother acknowledged that she was an "angry person" because she did not have her children and that she had "been under a lot of mental duress." However, after completing a mental health assessment, mother only participated in "some" mental health sessions. In addition, a February 2024 DHS Family Report entered into evidence indicated that mother "continues to report that she has not done anything wrong to her children" and that she "lacks impulse control." As a consequence, the juvenile court did not err when it concluded that mother had made insufficient progress toward ameliorating both jurisdictional bases and when it changed K's and J's permanency plans away from reunification.

We now turn to mother's fifth and sixth assignments of error, which concern C and K. Mother argues that the juvenile court plainly erred when it changed those children's permanency plans to "placement with a fit and willing relative." Specifically, mother argues that the error is plain because DHS planned to "keep [C and K] in permanent foster care and not actually place them with a relative."

DHS responds that the court did not plainly err "because under the applicable administrative rules, whether the [IDD] homes where the girls were placed could qualify as 'fit and willing relatives' is, at minimum, subject to reasonable dispute." We disagree with DHS's argument.

We may review an unpreserved error when it is "plain error." *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013). A "plain error" is "an error of law, obvious and not reasonably in dispute, and apparent on the record without requiring the court to choose among competing inferences." *Id.* If we conclude that an error is "plain," we must determine whether to exercise our discretion to correct it. *Id.* at 630; *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382, 823 P2d 956 (1991).

ORS 419B.476 describes how a juvenile court must conduct a permanency hearing. When, as here, the juvenile court decides to change the child's permanency plan away from reunification, the court must determine which of four potential permanency plans is the appropriate plan for the child. ORS 419B.476(5)(b). When the court determines that "the permanency plan for a ward should be placement with a fit and willing relative," the court must include in the permanency plan order its "determination of why placement with the ward's parents, or for adoption, or placement with a legal guardian, is not appropriate." ORS 419B.476(5)(f). That decision ultimately is a child-centered determination based on the child's circumstances at the time of the hearing. *See State ex rel DHS v. M. A. (A139693)*, 227 Or App 172, 183, 205 P3d 36 (2009) (describing the required determinations in ORS 419B.476(5) as expressing a legislative intent "that the [juvenile] court carefully evaluate DHS's decision to change a permanency plan for a child in order to ensure that the decision is one that is most likely to lead to a positive outcome for the child"). Generally, we review the court's disposition to assess whether the record, viewed in the light most favorable to the court's disposition, was legally sufficient to permit that outcome. *See, e.g., Y. B.*, 372 Or at 136 (so providing). However, whether the court applied a correct legal standard in making its determinations presents a question of law that we review for legal error. *See Dept.*

*of Human Services v. S. S.*, 283 Or App 136, 146, 388 P3d 1178 (2016) (so stating with respect to the required "compelling reason" finding under ORS 419B.476(5) and ORS 419B.498(2)(b) when changing a child's permanency plan to adoption). HS*S HS*

Here, the juvenile court based its determination on DHS's representation that the children's respective group homes qualified as fit and willing relatives under the statute. That was a misrepresentation of the applicable law, as explained below, and the court plainly erred in relying on it.

"'Fit and willing relative' means an individual who meets the eligibility criteria in OAR 413-070-1010." OAR 413-070-0000(32). Among those criteria, the individual must "[m]eet the definition of a relative" or "a person with a caregiver relationship under ORS 419B.116(1)." OAR 413-070-1010(1), (2). In turn, "relative" is defined in OAR 413-070-0000(80) and identifies a number of "individuals" who may qualify as a "relative" of the child through blood, marriage, adoption, or non-relative family association. Likewise, a "caregiver relationship" is defined "as a relationship between a person and a child" that meets the criteria on length of existence, occurs in the context of a shared household, and is in the nature of providing for the daily physical and psychological needs of the child, including "love" and "nurturing." ORS 419B.116(1)(a). There is no dispute that an entity—such as a group home—is not an "individual." Moreover, an entity cannot form a "caregiver relationship" with a child as defined in ORS 419.116(1)(a). Therefore, C's and K's group homes cannot qualify as "fit and willing relative" placements as a matter of law. The juvenile court erred.

Further, the legal error is "apparent on the face of the record." *Ailes*, 312 Or at 381 (internal quotation marks omitted). Here, the caseworker and DHS represented that both the agency itself and C's and K's respective group homes qualified as "fit and willing relative" placements. Specifically, the caseworker testified that DHS had not located any permanent placements for the children but that "the agency is classified as a fit and willing relative, so [C and K will] be able to stay [in their IDD homes] until they're 21 years old." In its closing argument, DHS further

represented that group homes were "fit and willing relative" placements.

> "[DHS]: A fit and willing relative for [C and K]? So it could either look like them remaining in a group home, because that satisfies the definition of a fit and willing relative, where they are located, so long as that home is meeting all of their needs, or it could be a [Greater Oregon Behavioral Health] placement, or more of an IDD foster placement. So that would be a typical resource home that the Court would see. It could also, down the road, like I had indicated, if changes are made, we could revisit placement and have an in-home potentially with [mother], should she meet the conditions for return at some point in the future. Fit and willing relative allows some flexibility in that regard."

Moreover, in making its determination, the juvenile court clarified:

> "THE COURT: [H]ow should I phrase this, to maintain essentially the things going in the same—the direction that they're headed with regard to [K] and [C]? That's the fit and willing—
>
> "[DHS]: Relative.
>
> "THE COURT: —relative, and that fit and willing relative can be an IDD placement, am I right?
>
> "[DHS]: Yes.
>
> "THE COURT: Okay. So that's pretty important in this case, because I see that as being a good, from what I can see, a good option, especially for [C]."

Here, the juvenile court erred as a matter of law and the error is "obvious and not reasonably in dispute and apparent on the record without requiring [us] to choose among competing inferences." *Vanornum*, 354 Or at 629. Therefore, the error was plain. *See id.*

We now determine whether to exercise our discretion to correct the plain error. *Id.* at 630. "That discretion entails making a prudential call that takes into account an array of considerations, such as the competing interests of the parties, the nature of the case, the gravity of the error, and the ends of justice in the particular case." *Id.* (citing

*Ailes*, 312 Or at 382 n 6). Our "decision to recognize unpreserved or unraised error in this manner should be made with utmost caution. Such an action is contrary to the strong policies requiring preservation and raising of error." *Ailes*, 312 Or at 382.

We elect to exercise our discretion to correct the plain error. As the Supreme Court explained, "[c]hildren have a right to 'permanency with a safe family,' ORS 419B.090(2) (a)(A), and the state has an 'obligation to create or provide an alternative, safe and *permanent* home for the child,' ORS 419B.090(5)." *Y. B.*, 372 Or at 144 (emphasis added). "The statutes governing permanency proceedings (ORS 419B.470 to 419B.476) were enacted * * * with the goal of reducing the length of time that children spend in substitute care." *Id.* at 144-45; *see also* OAR 413-040-0000(53) (defining a "permanency plan" as "a written course of action for achieving safe and lasting family resources for the child or young adult. * * * [T]he goal is to develop safe and permanent family resources with the parents, relatives, or other people who may assume legal responsibility for the child * * * during the remaining years of dependency.").

The gravity of the error was significant. Even though DHS had not located permanent placements or adoptive resources for either child, the agency urged the juvenile court to change C's and K's permanency plans away from reunification. After determining that placement with mother was not appropriate, the juvenile court changed the children's permanency plans to placement with "a fit and willing relative" based on DHS's representations, even though the court understood that the children could remain in their group homes until they reached adulthood, and that DHS could change the children's placements at its discretion. Failing to provide an appropriate permanency plan for C and K based on a plainly erroneous understanding of the law is a grave error and we exercise our discretion to correct it.

In sum, under the circumstances here, we conclude that the juvenile court plainly erred in changing C's and K's plans to placement with a fit and willing relative because that determination was based on DHS's misrepresentation

of the applicable law. Accordingly, we reverse and remand for the juvenile court to reconsider its determination of the appropriate plans based on a correct understanding of the law.

Judgments in case numbers 22JU01497 and 22JU01495 reversed and remanded; judgment in case number 22JU01496 affirmed.